RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RENE RAMIREZ GOMEZ,

*Defendant-Appellant*.

No. 24-5030

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:22-cr-00096-1—Clifton Leland Corker, District Judge.

Argued: February 7, 2025

Decided and Filed: March 3, 2025

Before: THAPAR, NALBANDIAN, and RITZ, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

THAPAR, Circuit Judge. This case forces us to confront the tragic consequences of a child rapist's illegal crossings into the United States. After Rene Ramirez Gomez unlawfully

entered the United States, he raped his biological daughter multiple times.  After serving a short state-court sentence, he was deported.

But he returned—crossing the border illegally yet again.  Operating under a false name, Ramirez Gomez sexually abused the three young children of his new girlfriend.  Indiana charged him for those offenses, while the federal government charged him with failure to register as a sex offender and with illegal re-entry into the United States.

Ramirez Gomez pled guilty to the federal charges and was sentenced to 51 months in prison, to be served on top of his anticipated state-court sentence.  He now brings two procedural challenges to his federal sentence.

I.

In 2004, Rene Ramirez Gomez entered the United States from Mexico and immediately began a life of crime.  First, he was arrested for using a driver's license without authorization.  Then, he was convicted of giving a false name to a law enforcement officer.  A few years later, he was convicted for driving under the influence of alcohol.  He was also arrested and convicted four times for driving without a license.

In 2014, things got more violent.  First, he was convicted of perjury for making a false report to police after he was "involved in a domestic violence incident involving a hit-and-run."  R. 25, Pg. ID 194.  What was the domestic violence incident?  A woman (apparently, a girlfriend of Ramirez Gomez) deliberately crashed into a car driven by Ramirez Gomez's wife before fleeing the scene.  When Ramirez Gomez's wife tried to call 911, he physically assaulted her and prevented her from calling the police.  After the police arrived, Ramirez Gomez was arrested and charged with domestic assault and interfering with emergency calls, but those charges were dismissed after he agreed to comply with certain conditions.  But Ramirez Gomez was convicted of perjury after he lied to officers by saying he didn't know the other woman.

Then, in 2015, Ramirez Gomez raped a young child—his own daughter.  He admitted to having sexual intercourse with his daughter, who was just 12 years old, multiple times over multiple years.  After serving fewer than two years in state prison, he was deported to Mexico.

Not long after he was deported, Ramirez Gomez illegally returned to the United States. This time, he went to Indiana, where he began using the fake name "Agustin Ramirez." He began dating a girlfriend, moved in with her, and had a child with her. But his girlfriend had three other young children living with them—two daughters and one son.

The district court found that Ramirez Gomez committed horrifying sexual crimes against these children. He "smacked" and touched the genitals of the two girls—the youngest of whom was just five years old—and digitally penetrated at least one of the girls. He also sexually violated the young boy. Ramirez Gomez physically hit the children, masturbated in front of them, and committed other appalling forms of abuse against them.

In addition to the physical crimes he committed against his girlfriend's children, Ramirez Gomez sent disturbing messages to his daughter—the one he raped during his first illegal stay in the United States—and his ex-wife. Ramirez Gomez used Facebook to contact his daughter, who had since been adopted into a new family. He asked her to leave her new family and come live with him. He also blamed his daughter "for what happened" and "encouraged [her] to misbehave at her adoptive parents' home." *Id.* at Pg. ID 189.

As for his ex-wife, Ramirez Gomez sent her text messages boasting about his connections to the MS-13 gang. He said he almost had someone "make 'salad' out of her." He threatened to burn down her home. Ramirez Gomez told his wife that she would soon be called the "black widow" because he would have her boyfriend killed—which he described as "not a threat, but a promise." *Id.* He also threatened to "get his daughter back, no matter what," and take her to Mexico. *Id.*

After these crimes were reported, law enforcement investigated and ultimately arrested Ramirez Gomez. Indiana charged him with the underlying crimes of child molestation. Tennessee charged him with violating his probation (for the earlier crime of raping his daughter) and brought two cases for "Violation of the Sex Offender Registry": one for failing to report his residence after re-entering the United States, and one for communicating with his daughter without her consent. Virginia also charged Ramirez Gomez with probation violations. For its

part, the federal government charged Ramirez Gomez with failing to register as a sex offender and illegal re-entry into the United States.

Ramirez Gomez pled guilty to both counts in the federal proceeding. The court sentenced him to 51 months in prison on each count, to run concurrently with each other and with any sentence imposed by Tennessee for one count of "Violation of the Sex Offender Registry" (for failing to register as a sex offender). But the district court ordered that the 51-month federal sentence would be served consecutively to any sentence imposed by Virginia or Tennessee, for the probation violations and the other case for "Violation of the Sex Offender Registry," or by Indiana, for the underlying child-molestation crimes. Put differently, the 51 months would be added on top of whatever prison time Ramirez Gomez gets from the state courts for the probation violations and sex offenses.

Ramirez Gomez now appeals his federal sentence. He brings two procedural challenges. We address each in turn.

## II.

Ramirez Gomez first objects to the district court's application of an eight-level enhancement to calculate his offense level under the Sentencing Guidelines.

## A.

When federal courts sentence a convicted criminal, they consult the Sentencing Guidelines issued by the United States Sentencing Commission. Using the Guidelines, courts must calculate and assign to the defendant (1) an offense level and (2) a criminal history score. Here, the district court determined that Ramirez Gomez had an offense level of 20 and a criminal history score of five, placing him in Category III, and resulting in a sentencing range of 41 to 51 months' imprisonment. *See* U.S.S.G. Ch. 5, Pt. A.

To arrive at an offense level of 20, the court applied an eight-level enhancement because it found that Ramirez Gomez failed to register as a sex offender, and then committed a sex offense against a minor. *See* U.S.S.G. § 2A3.5(b)(1)(C) (providing an enhancement "[i]f, while in a failure to register status, the defendant committed . . . a sex offense against a minor").

Everyone agrees that Ramirez Gomez has been "in a failure to register status" since he illegally re-entered the United States. *Id.* And the district court made a factual finding that Ramirez Gomez "committed . . . a sex offense against a minor" while in failure to register status. Why? Because he sexually abused the young children of his girlfriend.

On appeal, Ramirez Gomez argues that the district court shouldn't have applied this enhancement. He does not contest the district court's factual determination on appeal. Instead, he argues that the enhancement described in U.S.S.G. § 2A3.5(b)(1)(C) applies only when the defendant has been *convicted* of a sex offense. And Ramirez Gomez hasn't yet been convicted of the Indiana sex offenses—the charges against him are still pending in state court. He thus argues that the court didn't have the authority to make its own factual finding, by a preponderance of the evidence, that Ramirez Gomez committed a sex offense against a minor. Rather, he claims, a jury had to make that finding beyond a reasonable doubt.

We disagree. The Guidelines provision says nothing about a conviction. As other Guidelines provisions demonstrate, a sentencing enhancement only requires a conviction when the relevant guideline expressly says so. Nor does Ramirez Gomez raise a colorable constitutional argument. Accordingly, we join every other court of appeals to have considered the question and hold that § 2A3.5(b)(1)(C) doesn't require a conviction before it can enhance a defendant's sentence.

B.

Ramirez Gomez is making a textual argument about the meaning of the words "committed . . . a sex offense" as used in U.S.S.G. § 2A3.5(b)(1)(C). He doesn't challenge the foundational default rule of the Guidelines: typically, a judge may enhance sentences based on facts that the judge finds by a preponderance of evidence. Additionally, Ramirez Gomez disclaims any intention to bring a constitutional challenge to judicial factfinding in this circumstance. Rather, he argues that the text of U.S.S.G. § 2A3.5(b)(1)(C) requires a conviction before the enhancement may be applied. So, his challenge will rise or fall with our interpretation of the guideline's language.

1.

We start, as always, with the ordinary meaning of the text. U.S.S.G. § 2A3.5(b)(1)(C) instructs courts to increase a defendant's offense score by eight levels if, while in a failure to register status, the defendant "committed" a "sex offense against a minor." The verb "commit" means "[t]o do, perform, or perpetrate." The American Heritage Dictionary of the English Language (def. 1), https://ahdictionary.com/word/search.html?q=commit. The term "sex offense" means "[a] criminal sexual act." The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=sex+offense. Putting these definitions together, to "commit a sex offense" means "to do, perform or perpetrate a criminal sexual act."

This definition applies to Ramirez Gomez. The moment that Ramirez Gomez sexually molested the children of his girlfriend, he performed and perpetrated a "sexual act" that was "criminal."

The definitions of "commit" and "sex offense" say nothing about a conviction in court. The definitions don't indicate that Ramirez Gomez needs to have been *convicted of* doing, performing, or perpetrating a criminal sexual act. And that makes sense. As all English speakers will understand, an offense is "commit[ed]" the moment that the action is performed—not the moment when a court of law pronounces its judgment on whether the action was performed. Section 2A3.5(b)(1)(C) incorporates this plain-text understanding of the terms "commit" and "sex offense." Nothing in that language suggests that a person must have been *convicted* of a sex offense before a court can find that he "committed" that sex offense.

Our caselaw supports this reading. We've previously held that when a guideline uses the word "committed" in connection with "offense," a conviction is not required. *United States v. Winnick*, 807 F. App'x 464, 467 (6th Cir. 2020). In *Winnick*, the defendant objected to the district court's denial of a sentencing reduction under U.S.S.G. § 2P1.1(b)(3), arguing that the government failed to prove he "committed" a qualifying "offense" after escaping from custody. *Id.* In rejecting that challenge, we explained that "adequate proof" of whether the defendant "committed" an "offense" was "not restricted to convictions." *Id.* That was because the guideline at issue "uses the word 'committed[,]' not 'convicted.'" *Id.* In so holding, *Winnick*

cited decisions from other courts holding that "[t]he use of the word 'committed' in § 2P1.1(b)(3) suggests that neither a conviction for a felony nor even an indictment is required." *United States v. Charlesworth*, 217 F.3d 1155, 1159 (9th Cir. 2000); *see also United States v. Strachan*, 968 F.2d 1161, 1163 (11th Cir. 1992) (holding that a district court may deny the reduction "even if there has been no formal conviction"). Thus, when a guideline allows the court to enhance a sentence (or deny a reduction) based on a finding that the defendant "committed" an "offense," a conviction is not required.

Other provisions of the Guidelines also support this reading. When the Sentencing Commission wants to require a conviction before allowing a sentencing enhancement, it says so expressly. For example, § 2D1.1 (governing certain drug offenses) instructs courts to apply a two-level enhancement "[i]f the defendant is convicted under 21 U.S.C. § 865." U.S.S.G. § 2D1.1(b)(6). Likewise, the two-level enhancement in U.S.S.G. § 2L1.1(b)(3) applies only if the defendant "committed any part of the instant offense" after sustaining "a conviction for a felony immigration and naturalization offense." And U.S.S.G. § 2S1.1(b)(2)(B) (a money-laundering enhancement) applies only if the defendant "was convicted under 18 U.S.C. § 1956." As these examples make clear, the Sentencing Commission knows how to require a conviction as a predicate for an enhancement. That so many other provisions expressly require a conviction is powerful evidence that § 2A3.5(b)(1)(C) does not require one.

In holding that U.S.S.G. § 2A3.5(b)(1)(C) doesn't require a conviction, we join all four of our sister circuits that have considered the question. The Second Circuit led the way in *United States v. Lott*, 750 F.3d 214 (2d Cir. 2014). The defendant in that case raised the same challenge that Ramirez Gomez raises here. *Id.* at 220. Rejecting that challenge, the Second Circuit succinctly concluded that § 2A3.5(b)(1)(C) doesn't require "a sex offense *conviction* in order to apply"; rather, "conduct amounting to a 'sex offense' is enough." *Id.* at 220–21 (emphasis in original). Other circuits followed suit. *United States v. Ramirez*, 677 F. App'x 575, 578 (11th Cir. 2017) (per curiam) (explaining that "[t]he language of" § 2A3.5(b)(1)(C) "does not require a conviction," since it uses the word "committed" instead of "convicted"); *United States v. Gyde*, 731 F. App'x 336, 337 (5th Cir. 2018) (per curiam) ("[C]onviction of a sex offense is not required."); *United States v. Kokinda*, 93 F.4th 635, 649 (4th Cir. 2024) ("For a defendant to

qualify for the enhancement, the Guidelines only require commission of a sex offense, not a conviction."), *vacated on other grounds*, 145 S. Ct. 124 (2024) (mem.). These circuits all declined to insert a "conviction" requirement into the plain text of § 2A3.5(b)(1)(C), and so do we.

2.

Although Ramirez Gomez disavows any intention to bring a Sixth Amendment claim, he invokes that provision at various points throughout his briefing. For example, he states that enhancing a sentence based on judicial factfinding is "constitutionally dubious." Reply Br. at 2. He is wrong. In determining the appropriate Guidelines range, judges often have to find facts. Indeed, such factfinding is permissible so long as the factfinding does not increase the mandatory minimum or maximum penalties that a defendant faces. *E.g.*, *Alleyne v. United* States, 570 U.S. 99, 116–17 (2013); *United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008) (en banc). Here, it doesn't. All agree that Ramirez Gomez faced a statutory minimum term of zero years and a statutory maximum term of 20 years. The district court's application of § 2A3.5(b)(1)(C) did not alter that range. Rather, the enhancement simply altered the advisory range suggested by the Guidelines. Thus, applying this enhancement based on judicial factfinding doesn't pose a constitutional problem.

3.

For the sake of completeness, we now turn to the relevant provisions of the commentary to the Sentencing Guidelines. But first, a word of explanation. The Guidelines' "commentary" consists of suggestions from the United States Sentencing Commission on how to interpret or apply the Guidelines. *United States v. Riccardi*, 989 F.3d 476, 484 (6th Cir. 2021). Notably, this "commentary" doesn't go through the same approval process as the Guidelines' operative text. *Id.* It "never passes through the gauntlets of congressional review or notice and comment." *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam). For that reason, the commentary "has no independent legal force." *Id.* It contains merely "interpretations of"—not "additions to"—"the Guidelines themselves." *Id.* (citation and emphases omitted).

a.

For what it's worth, the commentary to U.S.S.G. § 1B1.3 supports our reading. There, the Sentencing Commission explains that some guidelines "may expressly direct" that a particular enhancement should be applied "only if the defendant was convicted" of violating a particular statute. U.S.S.G. § 1B1.3 cmt. n.7. But "[u]nless such an express direction is included, conviction under the statute is not required." *Id.* That rule, if legally binding, would summarily dispose of Ramirez Gomez's challenge. Section 2A3.5(b)(1)(C) does not include "such an express direction" that a conviction is required; indeed, it says *nothing at all* about a conviction. Accordingly, the Sentencing Commission would have us reject Ramirez Gomez's argument. Because the commentary's reading agrees with our own, we don't need to grapple with whether to defer to the commentary. *See Riccardi*, 989 F.3d at 485. *But see United States v. Havis*, 907 F.3d 439, 450–52 (6th Cir. 2018) (Thapar, J., concurring) (arguing that judicial deference to agencies, including the Sentencing Commission, poses grave constitutional concerns).

b.

Next, we turn to § 2A3.5's commentary, which suggests its own definition of "sex offense." The application notes to § 2A3.5 provide that "'[s]ex offense' has the meaning given that term in 34 U.S.C. § 20911(5)." U.S.S.G. § 2A3.5 cmt. n.1. In turn, 34 U.S.C. § 20911(5), a provision of the Sex Offender Registration and Notification Act (SORNA), defines "sex offense" in multiple ways—including "a criminal offense that has an element involving a sexual act or sexual contact with another." 34 U.S.C. § 20911(5)(A)(i). The district court relied on this definition in concluding that Ramirez had committed a sex offense under U.S.S.G. § 2A3.5.

As an initial matter, much of Ramirez Gomez's briefing proceeds from the premise that § 2A3.5(b)(1)(C) "incorporates" the definition of "sex offense" from SORNA. Appellant's Br. at 18–19. For example, he says "USSG § 2A3.5 expressly adopts the definition of 'sex offense' used in SORNA." *Id.* at 19. But that's not true. The *guideline* says nothing about SORNA; only the *commentary* does. And because, after exhausting "all the standard tools of interpretation," *Riccardi*, 989 F.3d at 485 (citation omitted), we find the meaning of "sex offense" to be clear and

unambiguous, we have no occasion to defer to the commentary's suggestion that we import the definition of "sex offense" from SORNA.

But even if we did import that definition, it wouldn't change anything for Ramirez Gomez. First, we note that the SORNA definition of "sex offense" suggested by the commentary doesn't actually differ from the definition we've derived. "[A] criminal offense that has an element involving a sexual act or sexual contact with another," 34 U.S.C. § 20911(5)(A)(i), is just a longer and more precise way of saying "a criminal sexual act," The American Heritage Dictionary of the English Language, https://ahdictionary.com /word/search.html?q=sex+offense.

So why does Ramirez Gomez think that the SORNA definition helps him? He argues that, if the SORNA definition applies, then that means other provisions in SORNA become relevant for determining the meaning of "sex offense." For example, Ramirez Gomez observes that the term "sex offender," as defined in 34 U.S.C. § 20911(1), means "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). But that doesn't bear on the meaning of the term "sex offense" in 34 U.S.C. § 20911(5), the provision to which the guideline's commentary directs us. In fact, the reference to a conviction in § 20911(1) actually hurts Ramirez Gomez's case—it shows that Congress knew how to specify that a conviction was required when defining "sex offender," but chose not to do so in the definition of "sex offense." The fact that Congress expressly required a conviction in § 20911(1) is evidence that § 20911(5), which doesn't mention a conviction, doesn't require one.

4.

Ramirez Gomez's other arguments fare no better. Moving away from the text of § 2A3.5(b)(1)(C) and from the Guidelines in general, Ramirez Gomez directs us to other statutes that, he thinks, use the term "offense" to mean "conviction." First, Ramirez Gomez invokes *United States v. Haymond*, which held that the mandatory revocation of supervised release and minimum prison term described in 18 U.S.C. § 3583(k) couldn't be applied unless the defendant had been convicted of the triggering criminal offense. 588 U.S. 634 (2019). But *Haymond* was a constitutional holding: judicial factfinding under the statute increased "the legally prescribed

range of allowable sentences in violation of the Fifth and Sixth Amendments." *Id.* at 646 (plurality opinion) (cleaned up); *see also id.* at 658 (Breyer, J., concurring in the judgment). The court said nothing about the ordinary meaning of the term "offense," let alone "commit" or "sex offense." And as already explained, judicial factfinding at Ramirez Gomez's sentencing presents no constitutional problems. Thus, *Haymond* has no relevance for this case.

Ramirez Gomez also invokes *Hughey v. United States*, 495 U.S. 411 (1990). There, the Supreme Court considered the Victim and Witness Protection Act of 1982. That statute authorized federal courts, when sentencing a defendant "convicted" of an enumerated offense, to order "that the defendant make restitution to any victim of such offense." *Id.* at 415–16 (quoting 18 U.S.C. § 3579(a)(1)). Critically, the statute in *Hughey*—unlike the guideline here—expressly mentioned a conviction. *Id.* (stating that a defendant must be "convicted of an offense" before the provision applies). The court held that this statutory language authorized restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction"—and not for other alleged offenses. *Id.* at 413. That holding is irrelevant for our purposes, since it deals with a statute that expressly mentioned a conviction and told courts what to do in response to that conviction. Here, by contrast, section 2A3.5(b)(1)(C) says nothing about a conviction.

Ramirez Gomez also discusses *Terry v. United States*, 593 U.S. 486 (2021). But that case has nothing to do with this one. *Terry* dealt with a portion of the First Step Act providing that a defendant could be eligible for a sentence reduction if he had previously received "a sentence for a covered offense." *Id.* at 492 (quoting Pub. L. 115-391, § 404(b), 132 Stat. 5194, 5222 (2018)). That text from the First Step Act shows why the *Terry* Court was concerned with convictions: A defendant who receives "a sentence for [an] offense" has necessarily been convicted of that offense. *Id.* But nowhere in *Terry* did the Supreme Court say that the ordinary meaning of "offense," as used in other contexts, requires a conviction. Thus, the First Step Act's use of the term "offense" sheds no light on the meaning of "sex offense" in U.S.S.G. § 2A3.5(b)(1)(C).

\*        \*        \*

In sum, Ramirez Gomez's challenge to his sentencing enhancement fails. Courts may apply the enhancement described in U.S.S.G. § 2A3.5(b)(1)(C) based on a judicial

determination, by a preponderance of the evidence, that the defendant "committed . . . a sex offense against a minor" while in failure to register status.  No conviction is required.

### III.

Ramirez Gomez brings a second procedural challenge to his sentence.  The district court ruled that Ramirez Gomez's 51-month sentence must be served consecutively—that is, in addition to—any prison sentence imposed in the Indiana state-court prosecution for the separate crimes of child sexual abuse.  Ramirez Gomez says this was error in light of U.S.S.G. § 5G1.3(c).  Under that provision, if a "state term of imprisonment" is expected to result from an offense that is "relevant conduct"[1] to the federal offense, then the sentence for the federal offense "shall be imposed to run concurrently to the anticipated [state] term of imprisonment."  U.S.S.G. § 5G1.3(c).  Thus, Ramirez Gomez argues, the district court should have imposed the federal sentence to run "concurrently" to the anticipated state term of imprisonment; or at the very least, it should have explained more clearly why it didn't follow the guideline.

Because Ramirez Gomez did not make this objection to the district court, he concedes that we review his challenge for plain error.

---

[1]Section 5G1.3(c) applies only if the anticipated state-court sentence results from an offense that is "relevant conduct" to the federal offense "under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3." U.S.S.G. § 5G1.3(c).  In his brief, Ramirez Gomez argued that the anticipated Indiana prosecution covered "relevant conduct" within the meaning of those provisions, because the conduct underlying the Indiana prosecution was the basis for enhancing Ramirez Gomez's sentence under U.S.S.G. § 2A3.5.  In its brief, the government didn't dispute this.  Instead, operating under the premise that § 5G1.3(c) applies, the government's brief argues that the district court didn't err in varying from that provision.  However, at oral argument, the government suggested for the first time that the Indiana sex offenses might *not* be the sort of "relevant conduct" that can trigger § 5G1.3(c).  The government asserted (without any reasoning) that Ramirez Gomez's Indiana offenses did not qualify as relevant conduct under § 1B1.3(a)(1), (2), or (3), which are the only subsections that trigger § 5G1.3(c).  To be sure, the government acknowledged that the Indiana sex offenses were relevant conduct by virtue of § 1B1.3(a)(4), which says that a sentence may be based on "any other information specified in the applicable guideline."  But that provision doesn't trigger § 5G1.3(c).  In sum, the government asserted for the first time at oral argument that § 5G1.3(c) doesn't apply in the first place.  Because of the government's concession in its appellate brief, we have no briefing on this point.  Ultimately, however, we need not decide it.  Even if we assume that the Indiana sex-offense prosecution covers relevant conduct that triggered § 5G1.3(c), Ramirez Gomez cannot benefit from that provision because the district court did not err in varying from it, as we explain below.

A.

The district court did not err, let alone plainly err, by imposing a consecutive sentence. To be sure, the guideline uses mandatory language. U.S.S.G. § 5G1.3(c) (stating that a sentence like Ramirez Gomez's "shall be imposed to run concurrently" to the anticipated state imprisonment). Nevertheless, the district court may, in an exercise of its discretion, refuse to apply this guideline.

In *Setser v. United States*, the Supreme Court answered the precise question before us now: "whether a district court . . . has authority to order that the federal sentence be consecutive to an anticipated state sentence that has not yet been imposed." 566 U.S. 231, 233 (2012). The Court held that district courts have "long been understood" to enjoy discretion to make a sentence either consecutive or concurrent. *Id.* at 236. And nothing in any federal law "foreclose[s] the exercise of district courts' sentencing discretion in these circumstances." *Id.* at 237.

That remains true today. U.S.S.G. § 5G1.3(c), enacted in 2014 in response to *Setser*, suggests how district judges might exercise their discretion in any given set of circumstances. But a district court remains free to vary from § 5G1.3(c). The Eleventh Circuit said it best: "Despite its mandatory language, § 5G1.3(c) is merely a recommendation, and courts may disagree with a guideline recommendation." *United States v. Ward*, 796 F. App'x 591, 598 (11th Cir. 2019); *accord United States v. Tillman*, 822 F. App'x 897, 899 (11th Cir. 2020) (same). Thus, "a district court is not required to impose a concurrent sentence, even if § 5G1.3(c) applies." *Ward*, 796 F. App'x at 598. The court need only "take [§ 5G1.3(c)] into account." *United States v. Olmeda*, 894 F.3d 89, 93 (2d Cir. 2018) (citation omitted). Ramirez Gomez concedes as much. Reply Br. at 20 ("True, the guideline is not binding, so a court can vary from § 5G1.3(c) just as it may vary from any other guideline in the advisory system.").

When exercising its discretion to impose a consecutive sentence, the district court must do two things. First, the court must "turn[] its attention to" § 5G1.3(c). *United States v. Johnson*, 553 F.3d 990, 998 (6th Cir. 2009) (citation omitted). A court may satisfy this requirement by offering "some explicit reference to the provision." *United States v. Hall*, 632

F.3d 331, 336 (6th Cir. 2011). But it need not do so, if "there is some other evidence in the record that [the court] considered the section." *Id.* In sum, the court needs to assure the parties and the public that it was aware of the guideline provision from which it was departing.

Second, the district court must explain *why* it departed from that guideline. This isn't a burdensome requirement. Indeed, the court need only "make[] generally clear the rationale under which it has imposed the consecutive sentence." *Id.* at 335 (citation omitted).

The district court satisfied both those requirements here.

1.

First, the court "turned its attention to" § 5G1.3(c). *Johnson*, 553 F.3d at 998. The court confirmed that it had read the defendant's presentence report—which explicitly referred to, and even quoted from, § 5G1.3(c). As we've previously held, a court can satisfy its obligation to consider that guideline provision by reviewing and adopting a presentence report that cites § 5G1.3(c). *See, e.g.*, *United States v. Hartman*, 426 F. App'x 395, 399–400 (6th Cir. 2011); *United States v. Hunt*, 32 F. App'x 716, 720 (6th Cir. 2002).[2]

The district court's review of the presentence report clears the low bar set by our caselaw. In *Hall*, for example, the district court's discussion of the relevant guideline provision was limited to the following: "there is a reference to the guidelines about consecutive sentences. I believe we had discussed that in chambers." 632 F.3d at 336. We held that this "indicate[d] that the district court considered § 5G1.3 when making its decision." *Id.* Here, the district court incorporated by reference the presentence report, which both discussed and quoted from the provision. Thus, although the court didn't utter the term "section 5G1.3(c)" during the

_____

[2]In citing cases such as *Johnson*, *Hall*, *Hartman*, and *Hunt*, we recognize that these cases did not interpret the current version of § 5G1.3(c)—which didn't exist until 2014. Only then did Amendment 787 add this provision to the Guidelines. So, even though these cases discuss "§ 5G1.3(c)," they were referring to the old version of that provision—which is now codified at § 5G1.3(d). *See* Amendment 787. That said, the 2014 amendment to § 5G1.3(c) didn't change the fact that district courts have discretion to impose a consecutive sentence under that provision. Under the old version, courts had permission to do so from the guideline itself; under the new version, courts are free to vary from the guideline's mandatory language. Thus, we cite pre-2014 cases because they correctly set forth the legal standard that governs a district court's duty of explanation when exercising its discretion to impose a consecutive sentence.

sentencing hearing, "there is some other evidence in the record that [the court] considered" that provision. *Id.*

What's more, the district court extensively explained why it was imposing a consecutive sentence—as discussed below.  This explanation, when coupled with the reference to the presentence report, shows that the district court was aware of "the guidelines about consecutive sentences." *Id.*

2.

Second, the court explained its rationale for running the federal sentence consecutive to the anticipated sentence for Ramirez Gomez's child molestation charges in Marion County, Indiana.  The record makes clear that the district court imposed a consecutive sentence (1) to replace the upward variance it had been considering and (2) because the Indiana prosecution targeted conduct different from that which supported Ramirez Gomez's federal sentence.

First, the court imposed a consecutive sentence as a substitute for an upward variance. The court originally believed that "this is not a guideline case." R. 51, Pg. ID 714.  That means the court planned to impose a sentence in excess of the Guidelines-suggested range of 41 to 51 months.  The court's view was that, "given [the defendant's] past convictions and the similarity of the conduct that he's engaging in now," there was "some justification" for imposing an upward variance. *Id.* at Pg. ID 721.  But the court didn't impose the upward variance, since "nobody [was] asking for" one. *Id.*

Why didn't the government ask for one, even though the government thought it "wouldn't be unreasonable for the United States to come up and argue for an upward variance"? *Id.* at Pg. ID 713.  The government didn't ask for a variance "in consideration of the charges" that Ramirez Gomez faced in other jurisdictions. *Id.*  Indeed, the government stated that a "top of the guideline sentence is appropriate" because, among other things, "[w]e don't know what's going to happen in Indiana." *Id.*  Likewise, defense counsel explained that Ramirez Gomez was "going to have to deal with the cases in Marion County, Indiana," among other things. *Id.* at Pg. ID 716.  As these passages show, the district court imposed a consecutive sentence as a replacement for the upward variance it was originally planning.  In the court's view, running the

federal sentence consecutive to the anticipated Indiana sentence was necessary to ensure that Ramirez Gomez's sentence was adequate in the absence of an upward variance.

What's more, the district court *did* run one of Ramirez Gomez's anticipated state sentences—an anticipated Tennessee sentence for failing to register as a sex offender—concurrently to the federal sentence. Crucially, the court's explanation for why it ran that sentence concurrently reveals why the court ran the other anticipated sentences consecutively. As the court explained, that anticipated Tennessee prosecution covers the exact same conduct for which Ramirez Gomez was being sentenced in federal court: failing to register as a sex offender. *Id.* at Pg. ID 724 (stating that the Tennessee sex-offender-registry prosecution "looks like it's exactly the same as this, and he's being punished for it, and so I'm going to run it concurrent"). Accordingly, the district court thought it would be unfair if Ramirez Gomez had to serve two separate prison sentences for the exact same conduct. *Id.*

By contrast, said the district court, the other state sentences—including the anticipated Indiana sentence for sexually molesting children—reflected conduct that was different from the conduct that led to Ramirez Gomez's federal failure-to-register conviction. *Id.* (explaining that "all the other violations that were not related to this," unlike the Tennessee sex-offender-registry prosecution described in Paragraph 63 of the Presentence Report, would be "run consecutive"). For that reason, the district court imposed the other sentences consecutively. *Id.* This alone makes clear why the district court ran Ramirez Gomez's anticipated Indiana sentence consecutive to the federal one.

Resisting this conclusion, Ramirez Gomez focuses on two comments. The court stated that "the Marion charges" (the Indiana charges for sexually abusing the children) had "kind of" already been "taken into account with the [eight-]level enhancement." *Id.* at Pg. ID 714. The court also stated that a "a within [G]uideline sentence that is consecutive to any of the VOPs [violations of probation] would . . . probably be adequate." *Id.* at Pg. ID 713. Ramirez Gomez observes that, in this comment, the district court mentioned only the probation violations; the court didn't say that the sentence would also need to run consecutive to the Indiana charges to be adequate. On the contrary, says Ramirez Gomez, the court thought the Indiana charges had already been "taken into account." *Id.* at Pg. ID 714.

But we disagree about the consequences of these comments.  Whatever the district court meant by them, they don't override the ample record evidence showing that the district court considered, but rejected as inadequate, the possibility of running the federal sentence concurrent with the anticipated Indiana sentence.

In sum, the sentencing hearing reveals a clear picture:  the district court originally felt that an upward variance was necessary to ensure an adequate sentence for Ramirez Gomez.  It changed course only after concluding that a sentence consecutive to the Indiana charges and the parole violations would serve the same function.  The district court also observed that the anticipated Indiana sentence covered conduct different from the federal charges—unlike the anticipated Tennessee sentence, which the district court imposed concurrently.  Thus, the district court adequately explained why it imposed Ramirez Gomez's federal sentence consecutive to his anticipated Indiana sentence.

## B.

Finally, even if we did think the district court erred by not giving an adequate explanation (and we don't), the error wouldn't be plain.  If Ramirez Gomez wanted a more robust explanation, then he should have raised his objection before the district court.

*          *          *

Ramirez Gomez raped his own daughter, was deported, and then returned only to molest three more children.  As the district court put it, Ramirez Gomez is a "complete predator on minor kids."  R. 51, Pg. ID 722.  For the reasons set forth above, we reject Ramirez Gomez's challenges to his 51-month federal sentence for (a) failing to register as a sex offender and (b) illegally re-entering the United States as a previously deported alien.